## CB & F INTERAMERICA, INC. and Farr Man Coffee Inc., Plaintiffs,

### v.

## AGRO INDUSTRIAS M & M S.R.L., Granos Favimi S.R.L. a/k/a Granos Favimi Exportadora S.R.L., Jose Luiz Manzoni, Nicolas Knoll and Fernando Mendonca, Defendants.

### No. 87 Civ 1445 (RO).

United States District Court,
S.D. New York.

Dec. 22, 1987.

Brauner, Baron, Rosenzweig, Klinger, Sparrer, Bauman & Klein, New York City, for plaintiffs; Mel P. Barkan, of counsel.

Shea & Gould, New York City, for defendants; Bertram Perkel, of counsel.

OPINION

OWEN, District Judge.

In March 1986, CIGC Inc., the predecessor of plaintiff CB & F Interamerica, Inc., a Florida corporation, and ED & F Man Ltd., the parent of plaintiff Farr Man Coffee Inc., a New York corporation, joined in a venture to purchase 300,000 bags of green coffee from defendants. Defendants are two Paraguayan corporations located in the same office in Asuncion, Paraguay, and their three principals, all residents of Paraguay. ED & F Man Ltd also financed loans for $3,000,000 to be used to purchase the coffee for resale to plaintiffs.[1] Under the oral agreement this working capital loan was to be reduced by $10.00 for each bag of coffee delivered. By late October

---

**1.** The loans are documented by promissory notes signed by defendants Manzoni, Knoll and Mendonca on the following dates for the following amounts, all due and payable on December 31, 1986: one note, dated March 26, 1986, $500,-000; one note, dated April 4, 1986, $500,000; eight notes, dated April 14, 1986, each $250,000; one note, dated March 26, 1986, $36,169.44 which represents interest on a portion of the earlier notes; and one note, dated April 4, 1986, $38,942.56, which represents interest on a portion of the earlier notes.

1986, 60,000 bags had been delivered and the loan had been reduced to $2,400,000 plus interest. At that point, the oral agreement was modified and reduced to writing. The written contract provides that the working capital loan, now financed by Farr Man, is to be reduced $20.00 for each bag of coffee delivered, and that the interest rate on the notes would be the Chase Bank prime plus ⅞%. On December 20, 1986, CIGC assigned all rights, title and interest in its coffee operation, including its rights and obligations under this contract, to plaintiff CB & F. Thereafter, the joint venture was that of CB & F and Farr Man.

Pursuant to the written agreement, defendants delivered 60,400 bags of coffee for which plaintiffs paid 80% of the then market price.[2] These bags were stored for plaintiffs in a warehouse in Asuncion, Paraguay. Under the terms of the contract, the price for the coffee was to be fixed "by mutual consent" on any date prior to shipment, allowing for a discount of $.30 per pound from the New York Coffee, Sugar and Cocoa Exchange "C" Contract.[3] In this instance, defendants elected to wait to fix the price of the coffee. By January 1987 the price of coffee had dropped so far

that the original 80% payment made by plaintiffs was more than 100% of the price then fixed for that delivered coffee.[4] Therefore by the end of December 1986, plaintiffs had fully paid for the 60,400 bags of coffee stored in the warehouse in Paraguay.

In January 1987, defendants, who served as export agents for plaintiffs under the Granos Favimi Exportadora name, telexed requests for the release of 16 warrants covering a total of 42,600 bags of coffee in order to ship the coffee to points in the United States and Europe.[5] Receipts for each of the warrants were signed by defendant Mendonca and the coffee was removed from the warehouse, as evidenced by the cancellation of the warrants by the warehouse. Defendants then advised plaintiffs that the 42,600 bags would be placed aboard vessels for shipment to United States and Europe.[6] However only 500 bags reached the destinations designated by plaintiffs. The remaining 42,100 bags were never delivered.

Plaintiffs commenced this action seeking (1) the market value of the 42,100 bags of coffee allegedly converted by defendants, (2) the unpaid principal and interest due on

2. Upon delivery to the warehouse, the coffee was inspected and receipts were issued by the warehouse and delivered to the Chase Bank in Asuncion. Once the bank received the receipts, Farr Man paid the defendants 80% of the then market price for the coffee.

3. The Affidavit of Salomon Kassin at Paragraphs 14 explains:
   ... in a declining market the amount of money advanced would come to exceed 80% of the value of the coffee.... To protect plaintiffs in such events, the defendants were required to deposit additional coffee in the warehouse ... so that the aggregate of all bags of warehoused coffee represented by the documents had a then current value equal to the amount of plaintiffs' 80% payment.

4. The Kassin affidavit continues: "What actually happened is that plaintiffs made their payment of 80% of value at the time of deposit and the market then fell to the extent that defendants were required to deposit, and did deposit, 18,200 additional bags of coffee as 'margin coffee'.... Since the price of the shipped coffee had not yet been fixed and the market continued to fall ... the balance owing to plaintiffs was much greater when ultimately, on January

15, 1987, defendants elected to fix the price of shipped coffee." ¶¶ 14–15.

5. The telexes requested the release from Chase of warrants numbers 350, 351, 358, 377, 343, 352, 357, 360, 347, 376, 378, 344, 345, 348, 353, 354, for a total of 42,600 bags of coffee. On January 15, 1987 warrants covering 11,00 bags were released by Chase to defendants. Similarly on January 27, January 29, and February 2, warrants for 20,600 bags, 3,000 bags, and 8,000 bags respectively were released to defendants.

6. Defendants advised CB & F that the coffee would be transported on the following vessels: 3,000 bags aboard the Olimpo bound for New York; 3,370 bags aboard La Victoria bound for New York; 5,000 bags aboard the Gabrielle D'Annuzio bound for New York; 16,500 bags aboard the Adriatic bound for New Orleans; 12,100 bags aboard the Argenrio I/II/Pta. Malvinas bound for New Orleans; 3,150 bags aboard the Mariscal Estigarribia bound for Spain and Portugal; and 8,500 bags aboard the M/V Adriatic. All the above vessels, with the exception of the Mariscal Estigarribia, arrived at their destinations without the coffee. The 500 bags which arrived on the Mariscal Estigarribia have been credited to plaintiffs.

the working capital loan, and (3) the over-payment made by plaintiffs for coffee actually shipped. By Memorandum dated April 22, 1987 I granted plaintiffs' motion for an attachment, finding that they had demonstrated a probability of success on the conversion claim. Plaintiffs now move for summary judgment on that conversion claim and on the claim for the principle and interest due on the working capital loan. The motion is granted as to both claims. Defendants' wildly shifting affidavits fail to raise a material issue of fact, and as a matter of law plaintiffs are entitled to judgment.

Summary judgment pursuant to Fed.R. Civ.P. 56(c) is appropriate where plaintiffs have come forward with undisputed documentary evidence supporting their claims, and defendants have presented inadequate factual support for their defenses.[7] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also Knight v. United States Fire Insurance,* 804 F.2d 9, 11–12 (2d Cir. 1986). The essential factual basis on which defendants' opposition rests is contained in the affidavits of defendant Nicholas Knoll, who claims to speak for all the defendants. A chronology of Knoll's various conflicting sworn statements illustrates why this court cannot and need not give credence to his word as evidence in opposition to this motion. *See e.g. Jurado v. Eleven–Fifty Corp.,* 813 F.2d 1406, 1410 (9th Cir.1987) ("The party opposing summary judgment cannot create a genuine question of fact by contradicting his prior sworn statement.")

(citations omitted). *See also Wade v. New York Tel. Co.,* 500 F.Supp. 1170, 1176 (S.D. N.Y.1980).

First, in an affidavit of March 23, 1987 submitted in the attachment hearing, Knoll stated that some of the coffee was still in the warehouse and the balance had been taken by plaintiffs to some unknown destination. Next, in an affidavit of September 16, Knoll stated that they had not delivered any of the coffee because the president of CB & F came to him and asked him not to tender delivery or ship the coffee. Finally, in a third affidavit of November 9, Knoll rejected his previous stories, admitted that he had lied to the court[8], and acknowledged that he and the other defendants took the coffee and disposed of it to recoup some of the money that they claim was owed to them.[9]

Knoll claims in this last version that plaintiff gave "tacit support" to defendants' removal of the coffee: "I suggest that I could reasonably infer that tacit support from the fact that it was almost impossible for plaintiffs not to have known exactly what we were doing." Knoll pleads, "While I admit that we resorted to self help to minimize our financial losses, I beg that you understand our sense that plaintiffs must have known what we were doing...." Knoll's defense in this last affidavit is that the coffee did not belong to plaintiffs and that therefore the motion for summary judgment should be denied.

In addition, plaintiff's agents, Besso, Kassin, Walker and Wolter all claim in affidavits that when they first confronted

---

**7.** Defendants have complained that as recently substituted defense counsel they have been unable to properly oppose this motion. This motion was noticed on August 6, 1987 and was not argued to the Court until November 13, 1987. This long delay was due to repeated extensions granted to defendant. Moreover, although defendants were granted leave to file an amended answer, they have not done so, nor have they requested relief pursuant to Fed.R.Civ.P. 56(f) by filing an affidavit setting forth the reasons why facts cannot be obtained. Therefore, defendant's protest that they have been "forced to proceed in an unreasonably short amount of time" is without merit.

**8.** "... I have not met my duty to be completely candid with the Court and my prior statements in this particular area are, at best, misleading."

**9.** Knoll makes this claim that it was defendants who were owed money, not plaintiffs, but offers no documentary proof. Defendants have not submitted an amended answer, which was claimed to be forthcoming at oral argument on November 13, 1987, containing this counterclaim.

Knoll he admitted the theft.[10] Those affidavits recite that on the evening of February 6, 1987, when plaintiffs learned that the coffee was not aboard the vessels, Knoll informed Kassin, the President of CB & F, by telephone that there was a "grave problem". On February 8, at the Fort Lauderdale airport, Knoll confessed that defendants had stolen the coffee to pay off suppliers to whom they were deeply in debt. Knoll allegedly said "we speculated, we lost, we paid with your coffee", and explained that it was "literally a matter of life and death in Paraguay" that they pay off their debts to suppliers. On February 13, in the Miami office of CB & F in the presence of Besso, Kassin, Walker and Wolter, Knoll again admitted the theft of the coffee but refused to sign a confession.

Given the undisputed documentary evidence submitted by plaintiff showing (1) that there was a contract, (2) that the coffee had been paid for pursuant to that contract, (3) that defendants cancelled the warrants for the 42,600 bags of coffee, and (4) that the coffee did not arrive on the designated vessels, summary judgment is appropriate on the claim of conversion. Summary judgment is also granted on the claim for the principal and interest on the loan which have come due under their terms.

Valuation of the 42,100 bags of coffee, and calculation of the balance due on the working capital loan remains. Defendants have neither submitted evidence nor offered argument on these damages issues. Therefore, in accordance with the proffers made by plaintiff as to the amount of coffee and the proper valuation, damages in the amount of $5,373,049.55 are awarded for the conversion of 42,100 bags of coffee. This figure represents a valuation of 42,100 bags of coffee, containing 132.2 pounds per bags, at a price of $.9654 per pound. The price per pound is the settlement price on the Coffee "C" Contract for the March 1987 contract on February 6, 1987, which

was the day the conversion was discovered by the plaintiffs, less the $.30 per pound discount called for in the contract. On the loan, again, defendant has submitted no evidence and has offered no argument as to the status of the loans. According to plaintiffs' factual submission the entire principal balance of the 10 notes, $2,033,200, plus interest of $75,112 is due, together with interest from October 24, 1986 to this date at the Chase prime rate plus 7/8%. Such sum is also awarded to plaintiffs.

Submit order on notice.

---

**10.** According to these affidavits, defendant Mendonca also admitted the theft. On February 9, 1987 Mendonca telephoned Walker, admitted that defendants had stolen the coffee, and explained that the suppliers "had a gun to my head." Walker Aff. ¶ 5. On February 10 Walker and Besso met with Mendonca who confirmed the theft of the coffee. Mendonca apologized for having "become a bandit". Besso Aff. ¶ 23, Walker Aff. ¶ 6.